Case number 24-5588, State of Tennessee et al. v. Miguel Cardona et al. Oral argument not to exceed 20 minutes to be shared by plaintiffs and intervenors, 20 minutes for defendants. David Peters for the appellants. You may proceed. Good morning. Good morning and may it please the court. David Peters on behalf of the United States of America would like to reserve five minutes for rebuttal. Very well. The district court fundamentally erred in issuing a sweeping preliminary injunction barring enforcement of the Department of Education's 2024 final rule. There are many problems with the court's injunction, but most fundamentally the court misunderstood how the various and separate provisions of the rule operate, and in particular it misunderstood the function of 34 CFR 106.10. Properly understood, that provision answers a single question. What does the statutory language on the basis of sex mean? As relevant here, 106.10 makes clear that when a school engages in conduct that everyone who agrees discriminates against a student based on their gender identity, such as giving a student detention simply for being transgender. That conduct is discrimination on the basis of sex for purposes of Title IX. That is because, as the Supreme Court recognized in Bostock, discrimination based on transgender status necessarily entails discrimination based on sex. The first cannot happen without the second. Can we go back for just a second? The state seemed to argue that the Supreme Court has already resolved the preliminary injunction issues. I was on the motion and I know that the Department of Education at that time was seeking to state an injunction as a way to provisions that the states did not challenge. What sort of arguments did the Department of Education make before the Supreme Court? The Supreme Court's decision on the state applications do not control this appeal because the question presented before the Supreme Court was just different than the question presented before this court. So before the Supreme Court, the question was whether the government had met its burden to establish in an emergency posture while the appeals were pending in this court its entitlement to emergency relief, in particular as to the unchallenged provisions of the rule. The question before this court is just different. It is whether plaintiffs have met their burden in district court, met their burden to show their entitlement to a preliminary injunction for relief. So the questions are just not the same. And the Supreme Court's decision that the government had not met its burden doesn't relieve this court of its obligation to determine whether the plaintiffs met their burden below. So the Supreme Court's decision just doesn't control here. And again, to the extent that the plaintiffs are invoking the reasoning of the Supreme Court's decision in the state posture, the more appropriate reasoning is really the Vostok decision because it is the Vostok decision that addressed a materially identical language in Title VII. So in Vostok, the question was whether Title VII prohibition on discrimination because of sex means that gender identity discrimination and sexual orientation discrimination is necessarily sex discrimination. And the court concluded that it was based on the text of, and critically the text of because of. Well, over here we don't have because of. We have on the basis. And isn't the basis singular as opposed to multiple causes as Vostok viewed it as multiple? No. But for causation. On the basis of that language imposes causation standard that is no more than but for. And this is really the fundamental problem. It's the, though, isn't it? Which means singular and not plural. You don't agree that the is singular? The is singular, but the textual language on the basis imposes no more than but for causation. And if there was a question about that court, your honor, no court, no decision of this court, no decision of any other court of appeals, and no decision the Supreme Court has ever suggested that on the basis of imposes a causation standard that is higher than but for. And in fact, there's any number of statutory phrases that the Supreme Court identified in Vostok that impose the same kind of but for causation. And a few of them do have that kind of the phrasing. So there's based on, on the basis of, on account of. And I think the critical one is on the ground of. So on the ground of language comes from title six. And title six is the provision that title nine is modeled on. And if there's any question as to whether Vostok's reasoning applied to language like on the ground of or on the basis of, I would point to this court, to the Supreme Court's decision in the student for fair admissions case two terms ago from the Supreme Court. There, that was the case about race-based admissions programs at Harvard and UNC. And the court struck it down based on the equal protection clause. But I would point the court to the concurring decision of Justice Gorsuch, who of course wrote Vostok. And he applied Vostok's reasoning to the language of on the ground of to conclude that it too imposes but for causation. Okay, even if I agree with you that they both have but for causation. I mean, I see as Vostok has, as I said, multiple but for causes are allowed. Well, title, title nine is a singular. This is from Vostok, page 661. When an employer fires an employee because she is homosexual or transgender, two causal factors may be in play. Both the individual's sex and something else, the sex to which the individual is attracted or with which the individual identifies. But title seven doesn't care if an employer would not have discharged an employee but for that individual's sex. The statute's causation standard is met and liability may be detached. But isn't it quite clear that it's the multiple causations, the Vostoks, that's the heart of the opinion? That's true in the title nine context, Your Honor. I mean, it is. It is not. The language we're looking at is the basis. But Your Honor, the question is whether on the basis imposes but for causation. And if it does impose, it does impose but for causation as every court of appeals has ever held, right? And just to realize, if this court holds that on the basis of imposes a causation standard that is higher than but for causation, that would really single out title nine as a unique statutory provision amongst non-discrimination. It's a spending provision, is it not? Your Honor, it is. But as a spending provision, it has to be a clear statement. But any question about the clear statement principles really are separate from the question of whether on the basis of imposes a but for causation standard. If it's not clear to the educational institutions that accept federal funding and thereby by accepting the federal funding, they have to comply with it, I think it violates the clear statement rule. I disagree, Your Honor. And I disagree because of this. On the basis of sex, it imposes a no more than but for causation standard. And if that is plain from the statutory language, because courts routinely understand, including in title nine cases, that on the basis of imposes no more than but for causation. To illustrate the point, if the example you just provided in the BASA context was about firing someone, in title seven, because of sex means that if you fire someone because they are transgender, you are necessarily discriminating against them on the basis of sex. The same is true in title nine. If you give a kid detention simply for being transgender, you are discriminating against that student on the basis of sex for purposes of title nine. Plaintiffs, and that is true, all 106.10 does, Your Honor, that provision in the rule, answers that simple question. On plaintiff's view, they think that title nine has nothing to say in the context when schools give the kid detention for being transgender, they bar a kid from homecoming for being gay, they force a student to sit on the back of a bus for being transgender, or bar them from band, or bar them from homecoming, or bar them from the pep rally. Their view is that title nine has nothing to say about that and has nothing to do with the individual's sex. And that just cannot be reconciled with the reasoning of BASA. Plaintiffs now say that they aren't going to engage in that kind of conduct, and that's, I guess, good as far as it goes, but their view is that title nine has nothing to say about that. How do you explain the inconsistent positions of the Department of Education over the years on this issue, particularly in view of the requirement of a spending provision to be a clear statement? I mean, the Department of Education has gone back and forth repeatedly on this issue, has it not? On this issue, I take the court to be suggesting that whether gender identity discrimination and sexual orientation is covered by title nine. It has not gone back and forth, Your Honor. I mean, there was a memorandum, I believe, that was issued in late 2020 after the Bostock decision, and in the final rule, the Department explained why. Due to a technical issue, this section of audio was not captured. You finally said yes. You've changed their position over the years, right? Their position has evolved in light of the Supreme Court's decision in Bostock. Does that have an impact on the clear statement rule under the spending clause or not? No. No. Tell me why not. The question about whether Congress has spoken sufficiently clearly in setting conditions on federal funds is based on the text of the statutory provision. It's whether Congress has spoken clearly enough. And it is quite clear that the unambiguous language of title nine… The fact that your department, your client, has changed its position, has taken inconsistent positions, isn't that evidence that it is not clear? No. I mean, I would point to the Supreme Court's decision in the Davis case, right? That was about harassment. And one of the points that the Supreme… Just a minute. Does the clear statement rule, does that apply to the statutory language or to the rule? It is the statutory language, right? It's whether Congress has spoken clearly about whether to… in setting conditions. And it is unambiguous in the statutory language that title nine's prohibition on discrimination on the basis of sex includes discrimination on the basis of sexual orientation and gender identity. That's just plain and… Even though your department argued the opposite just a few years ago? I mean, I would point to the Supreme Court's decision in Bostock. I mean, their Justice Court has observed that very few people in 1964, when that title seven was first enacted, would have thought that it prohibited discrimination on the basis of gender identity and sexual orientation. And the court said that doesn't matter, right? We look at the plain text because that is the indication of whether Congress has spoken clearly. And Congress spoke clearly. I mean, that wasn't a spending clause legislation, but that was a case in which the Supreme Court said there are no elephants and mousetraps here. The language is unambiguous. And the same is true of title nine. My point just to earlier was that in the Davis case, right, where that's about sexual harassment, one of the arguments that the dissent made there was that no one understood when title nine was first enacted. How many other circuits have made a ruling on this issue? Several circuits, Your Honor, have recognized that Bostock's reasoning applies to title nine. I would point to the seventh, the fourth, the ninth. I would also point to the tenth circuit, where the tenth circuit has realized that Bostock's reasoning is not confined to title seven and that any kind of… Of course, the holding is about title seven, but that just reflects the fact that the only question before the Supreme Court in Bostock was about title seven. What do we do with those cases in the sixth circuit where we've suggested that Bostock doesn't apply outside of the title seven rule? None of those cases, Your Honor, concern title nine. So to the extent the court said anything about them, it's clearly dicta. I mean, I would point to the example in the Scremendi case, right, that was an equal protection clause case. And the court there held that Bostock didn't apply to the equal protection clause because the statutory language was different between title nine and obviously the constitutional provision. But the statutory language here is identical. And so those decisions just do not control here. In the Pelcher decision, that's an ADA claim, again, not about title nine. In Merriweather, the other case of plaintiff's site, that's a case where the court just observed that there are exceptions to title nine that don't exist in title seven but didn't have anything to say about whether title nine imposed a causation standard that's more than but-for. Let me ask you about the hospital environment provision. It seems that that provision is contrary to Davis. So Davis sort of talked about the residence to be offensive, severe, and pervasive, and the rule says severe or pervasive. Why isn't that contrary to the law? Because Davis doesn't control. Davis was a case about whether the implied cause of action for title nine would reach certain types of conduct. And so the standard that was announced in Davis doesn't control the administrative enforcement context. And the reason we know that is because in Davis, the Supreme Court said we are doing something here more than evaluating whether harassment is covered by title nine. We are evaluating whether a particular party can be held liable for a particular set of remedies. And so Davis does not control. So what is the legal authority for that provision? The best indication, Your Honor, is that in the Supreme Court's decision in Harris, and that's the title seven case, when it articulated a standard for what hostile environment harassment entails, it used severe or pervasive to determine as an indication of what kind of conduct need to be shown to rise to a level of hostile environment harassment. And so title nine tracks that. I see my time is running out. I might just answer this. In Davis itself, the Supreme Court cited approvingly then existing Department of Education guidance as to what the appropriate standard was for hostile environment harassment. And there too, the standard was severe or pervasive, which of course is the standard that this court has applied in both the title seven and title nine context for decades without any concerns that have raised First Amendment concerns. I see my time is up. Thank you, Peter. If any further questions at this time, Judge Simon, Judge Mathis. You will have your five minutes. Thank you. Good morning. Good morning, and may it please the Court. My name is Whitney Hermendorfer from the Office of the Tennessee Attorney General on behalf of the Plain of States. Title nine does not require that girls shower and then dress with boys, compete against boys with physical advantages, and room with boys on overnight school trips. But the rule imposes these and other unprecedented mandates that gut title nine's protections for women and privacy. The Supreme Court was right when it unanimously concluded that the states were, quote, entitled to preliminary relief, and so were the ten other courts who held similarly. I have one preliminary question, I guess, that besides three states that are within our circuit, we also have the Commonwealth of Virginia, we have the states of Indiana, and West Virginia. What is our authority to issue a preliminary injunction regarding the Commonwealth and the two states that are not within our circuit? This court has authority because the case has properly been viewed and those states were properly joined as parties. And importantly, Judge Griffin, this might be a different situation if the Fourth Circuit, for example, had actually opined on this particular rule at issue. But no court in those jurisdictions has that case before it, and so there's no risk of conflicting judgments coming out of those circuits with respect to this promulgation. And so I think that's why the government has not put any sort of venue-based limitation on the rights of those states to obtain relief. And relief for them would be important because it would enjoin those states from needing to roll out these rules, burdensome mandates that go over and above any obligation that they have right now under existing Title IX law. And I want to start, if I might, with the Supreme Court decision. And Judge Mathis, you asked what was before the Supreme Court, and my friend on the other side mentioned that it was a scope of relief question and the burdens were different. But the Supreme Court, nine justices, wrote what they wrote in the opinion, and that was we are entitled to preliminary injunctive relief. That is not about the government making its stay burdened. That was about whether we properly received relief from the district court. So that's number one. Number two... I mean, did the Department of Education make the argument? Were they arguing about the provisions at issue? Absolutely, Judge Mathis. And I'll point you, it's right there in their introduction of their stay motion, and I can quote it to you. It says, one of the reasons they said it was improper to issue the injunction against Section 106.10, which is the Bostock provision, was that Chief Judge Reeds just got the merits wrong. And they say, quote, Section 106.10's inclusion of gender identity is compelled by a straightforward application of Bostock. That's at page five. They then went on at length to tee up the merits of the Bostock question. So that was front and center in the court. And then, as Your Honor knows from the state panel, part of their scope of relief argument was, well, the provisions that are enjoined, the three principal provisions, interact with the other provisions. That was our position. They rebutted that. But, of course, to know the scope of relief that would be appropriate, the Supreme Court had to determine what other provisions were lawfully enjoined. And so that is why the merits, I think that's why we saw the court there opine on the merits of those three provisions. So I don't want to belabor the point. We think the Supreme Court case is highly persuasive at a minimum, and it would be the government's just asking you to say, we are not entitled to preliminary injunctive relief. When the Supreme Court wrote that accepted, we were entitled to preliminary injunctive relief. The Supreme Court, in their procuring opinion, also said the Sixth Circuit has already expedited consideration of the case and scheduled oral argument. We scheduled oral argument on the preliminary injunction. That's what we scheduled it for. Well, Judge Griffin, that part of the discussion was in particular with respect to the scope of relief paragraph, and I do think there is a distinction in the way the court was setting that out. But I don't want to rest solely on that. I think our merits case speaks for itself and stands alone. And I think I would like to start with a but-for causation point that, Your Honor, Judge Griffin was discussing with opposing counsel. Is there any case that you can point to on that particular issue that suggests that the cause of it is different from on the basis of it? Well, I think what's most important, Judge Mathis, is that this court in Pelcha had before it a provision under the ADEA that used identical text. ADEA uses because of age. And the court there said you cannot just, and that was the same language. I think the language here is different. And the court there said we can't apply Bostock because there are structural features and background of that statute that are different. And so I think Bostock itself notes that differences in language, differences in structure, differences in precedent all matter, and that's why this court in Merriweather said you can't just automatically import Bostock into other contexts. But Bostock used because of and on the basis of interchangeably throughout the opinion, including in the very first paragraph. I think that that's correct, Your Honor, but we don't tend to read opinions usually like statutes, and typically the rule is if statutory language Congress has chosen is different, we think those differences matter. And I do think the textual difference matters here in the way Judge Griffin was suggesting, which is what Bostock did that was novel is it used but for causation to take one characteristic and say even though that was the discrimination, logically it's related to some other characteristic and we're shifting the protection. That's not the analysis that Title IX can undergo without defeating the entire statute, which makes sex-based discrimination, sex-based distinctions throughout the statute. And so the basis suggests that the basis needs to be the sex of the student. And I think the structural points here are overwhelming in our favor because if the government is right, the government can't just take the one part of Bostock about discrimination on the basis of gender identity is discrimination because of sex and import that in without importing in Bostock's limitations and its logic. And the logic of their position is that any time a statute draws a sex-based distinction, it's going to discriminate because the logic will always be, well, if I'm a boy and I want to play on the women's volleyball team and I can't, that violates Bostock because if I had been a girl, I would have been able to play on the team. And that's the logic that Bostock employed. If you apply that to Title IX, the whole statute falls apart and the whole statute and the regulations have been violating themselves since 1972. And we know that because of provisions like 1686, Your Honor, which is… But don't we have cases that say that in Title IX cases we can look at Title VII for guidance? That's absolutely correct. I think the more probative cases here, Your Honor, are the cases saying you cannot apply Bostock beyond Title VII without at least a minimum looking at the structural differences of the statute. And again, you cannot cover… I do want to just make a factual point about this notion of schools barring people who are transgender from the lunchroom and getting them demerits and things like that. Chief Judge Reeves concluded that there was, quote, no evidence of such things occurring in the plaintiff state's jurisdiction. That's in ID 2401. So I do want to put that factual point on the table, that there has been no suggestion that this is occurring, and that's because there are other protections that govern that type of conduct at the state and local level. Now, going back to the structural point, again, a provision like 1686, which says Title IX's anti-discrimination rule shall not be construed to bar different housing for the different sexes. Other provisions like that appear throughout Title IX and the regulations that were passed right after Title IX's passage. And so the government's position is that things like sex-separated bathrooms have always been unlawful under the clear text of Title IX since 1972. That's not only a logical problem for them, that's a pending clause-clear statement rule problem, Judge Griffin, because as this court noted in the Department of Education guidance case, there has been no agency practice over 40-plus years of covering things like this. And their position has changed, and the reason I submit their position has changed is because if you adopt their position, it creates a host of problems that you have to... You're saying their position has changed as it relates to the sex discrimination provision? The meaning of... On actually a few fronts, Your Honor. So the first is just does sex discrimination cover gender identity and sexual orientation discrimination? We see that difference between 2016 and 2020, for example. But even within the department's guidance that has recognized some sort of coverage, their position has changed there, too. In the 2016 guidance document, they said actually the housing provision does not allow you to sex-segregate. They've now changed their mind on that. In 2021 and 2023, in the BPJ case, they said the sports regulations also do not allow you to sex-separate and cannot override the statutory provisions. Now they're trying to put sports into the statutory box, I submit, because the logic of saying that you cannot sex-separate sports, there's nothing that highlights... How does that go to the spending clause issue? I thought spending clause, we looked at the statutory language, and the statutory language hasn't changed. Does the spending clause also apply to regulatory changes? Well, I take them at some points to be arguing that regulation should be putting parties on notice. I think that that's wrong, but even if you accept that, the fact that they can't get their story straight with respect to what the statute means I think is a problem from a notice perspective. It also indicts the plausibility of their interpretation period, which is that Title IX requires... I mean, everyone agrees what Title IX was doing. It was trying to promote opportunities for women in education, and their position under the de minimis harm regulation and under what they think it means to do things like stereotyping is that you must allow men who identify as women into bathrooms, into locker rooms, into PE class, into sex ed class to learn about body parts they don't have, and that reading subjugates the rights of women to the rights of men in many contexts, and that's... I mean, but you agree men can bring viable Title IX claims, right? Absolutely, and this can cut just as easily against men who likewise have deeply held privacy objections to being in an intimate facility with a person of the opposite sex. The government's rule dismisses any of those privacy concerns as, quote, not legitimate, but this Court's cases and the Supreme Court's cases going back decades recognize the interest in that type of privacy concern about intimate exposure to members of the opposite sex. So I do want to hit on one other... Well, one last thing on the spending clause. Their position now on scope of relief, on page 52 of their brief, is that the text itself can just be implemented right now, and I suppose the text wouldn't require gender identity or sexual orientation discrimination, but I can't understand how that can be true. They say if you just let the rule go into effect now, it doesn't need to cover gender identity discrimination. You can just apply it, quote, in accordance with the text of Title IX. How can it be the case that the text of Title IX is itself so clear and unambiguous, as my opposing counsel said, that it covers gender identity discrimination, but yet it doesn't when they're trying to implement the rule at this partial stage? But Title IX also doesn't say anything about retaliation, and the Supreme Court in Jackson said that there's no spending clause violation, and it does encompass retaliation based on sex discrimination. So what Jackson, Your Honor, was doing is something very different, which is what we often see in broadly worded discrimination statutes, is it's saying retaliation is a type of sex discrimination. What we're doing here is saying there is an entirely new class of individuals that are covered not based on their biological sex. What's the most difficult case you have to overcome to win in this case? I think there are other circuits, as my opposing counsel pointed out, that have gone against us. But we have a split in the country. That's true, Your Honor, but I think the reasoning of those decisions actually helps us because those cases both assume it's stereotyping to recognize biological differences. The LW decision rejects that. They also assume gender identity discrimination means sex discrimination, which is an argument my opposing counsel in the rule disavow. Counsel, can you talk about the other provisions? There are three provisions of the final rule that have been challenged, but the rule has a lot of other provisions. And as Judge Mathis pointed out in his dissent in the motions panel, those apparently are not challenged by the plaintiffs, so why should we not allow them to go into effect? Do you have the other provisions? So I think, Your Honor, the conclusion that they are not challenged by the plaintiffs is maybe where I would start, which is they are challenged by the plaintiffs to the extent they are incorporating prolifically the provisions that we say are unlawful. And what Chief Judge Reeves did was something the only district court in the country to do this, which is he had witnesses and he heard testimony on this. And what that testimony bore out is that it would be extraordinarily confusing and costly to try to have the court implement direct states to implement a partial version of the rule that is not actually a rule the government ever has justified or promulgated, and then to have to go back and retrain all of its employees about what the rule actually means after final judgment. And I think there's a reason why district courts have, quote, as the Duster case we cite point out, to craft temporary interim relief, and that is to take stock of these types of on-the-ground realities that parties are wrestling with. And Chief Judge Reeves appropriately did that. There's nothing different about the government's arguments to the Supreme Court and to the state panel than the ones that Chief Judge Reeves heard, and they were both rejected. So this court would have to conclude Chief Judge Reeves abused his discretion by rejecting the same arguments the court did. And I've never heard of a rule where a party who prevails on preliminary relief must nonetheless roll out a partial interim version of a rule and then double its cost by retraining later. Okay, but as we talked about, that was on the motion to stay, the preliminary interruption. Now we're getting this is on the preliminary interruption itself. And you say that somehow these three provisions will relate to the other provisions. I mean, I've looked at them, and they don't seem to be in any relationship at all to these challenge positions. And if there is a relationship, tell me what it is. Absolutely. So I would direct you to our stay phase filing where we had a supplemental brief where we stepped through one by one each of the provisions. But I'll just give a few examples. Tell me where in your brief it is, too, because I was expecting you to have a lot of information on your brief, in this case, telling us why the preliminary interruption was overbroad. I think you have like two pages in your brief at the back of it. It doesn't say anything. So we incorporate by reference that extensive pleading in the last few pages of our brief, Your Honor. But I'm happy to explain just if you put yourself in the position of a person trying to implement this rule at a partial level. So there's the definition of complainant, for example. Who qualifies as a complainant turns on what conduct is protected under 106.10 and 106.31. So, too, what evidence is relevant. And any time those provisions rely on sex discrimination, that is affected by the provisions we've challenged as unlawful. And it's fair enough, Your Honor, that perhaps at the end of the day, at final judgment, there would be a severability holding that certain of these provisions should be able to take effect. I think, as the stay panel majority noted, there has been no cost benefit justification for just forcing schools to implement part of these provisions, the more ancillary ones, without even the core provisions that justify the rule in the first place. But I think the issue is, did Chief Judge Reeds abuse his discretion at this interim posture by concluding that the facts on the ground warranted keeping the injunction as is, as opposed to this partial compliance exercise with hundreds of thousands of teachers that affects millions of students? And we don't think that was an abuse of discretion, Your Honor. Any further questions at this time, Judge?  Thank you. Good morning. Good morning, Your Honor. My name is Jake Warner. I represent Intervenors AC and Christian Educators. May it please the Court, just a few points this morning. Your Honor, first, Title IX deals with education. Sex matters for assigning showers, locker rooms, and sports. It doesn't for hiring a law clerk. Because Title IX doesn't forbid considering sex to ensure equal opportunities for men and women, Bostock doesn't fit. And that tracks what this Court said in Scrimeti, Pelcha, Merriweather, and perhaps other cases. Bostock applies only to Title VII. Otherwise, women's sports, showers, and locker rooms are illegal. That's not the law. Second, the rule punishes those that Title IX protects. AC is case in point. When she was in middle school, a younger male who identifies as a girl competed on her track team. That male beat nearly 300 different girls in over 700 instances. The male also changed in the girl's locker room and sexually harassed AC. Girls like AC don't have equal educational opportunities when they're denied the critical benefits of sex-specific spaces. The new rule threatens those protections contrary to law. Third, applying Bostock would pit Title IX against itself. As our brief shows, Title IX forbids treating one sex worse than the other. It does not forbid sex distinctions. And the statutory context confirms this. Take Section 1686. It is a construction rule that forbids construing Title IX's nondiscrimination mandate to forbid a sex distinction. So the text of Section 1681A's nondiscrimination mandate must be construed to allow sex distinctions necessary to prevent sex-based denials and exclusions. Bostock doesn't apply. Fourth, because Title IX allows sex considerations to ensure equal opportunities for men and women, Bostock doesn't apply. But to pursue its policy goals, the Department invented a biased de minimis harm rule that elevates gender identity over sex. The rule allows sex distinctions except as applied to individuals who identify as transgender. So under the rule, excluding males who identify as female from a women's locker room causes more than de minimis harm. But when any male accesses the women's locker room, women have their unclothed bodies exposed to a male, subjecting them to the exact harm that the sex-specific space was designed to forbid. The rule disregards that harm. Fifth, a line-item injunction is improper. The U.S. Supreme Court has already upheld the scope of the injunction at the state level, and for good reason. Not only did the Department fail to prove severability, it also waived the argument. In blue penciling, the rule is quintessential executive work. Congress established vacator relief to keep courts from judicial rulemaking. We're in the APA context here, where vacator is the likely remedy at the end of this case. You said they forfeited the severability argument. Can you explain how they forfeited it? Well, the government mentioned this argument in two lines in briefing below, and they did not specify in sufficient detail to the district court which provisions could be severed and how plaintiffs could be protected, yet still allow their rule to partially apply. Wasn't it also argued before the Supreme Court the severability question? They did at the state level, but of course, as this court understands before the district court, didn't they argue? I mean, that was a hearing before the district court. Wasn't it argued during that hearing? It did come up in oral argument, Your Honor, but the government did not specify in sufficient detail which provisions could be severed and how they could be severed, nor does the rule justify the cost based on the independent applications of the rule. And I think it's critical to know that, again, now we're in the APA context where a vacator is the likely final remedy. Congress established this remedy to prevent courts from having to go into judicial rulemaking. The proper course for this court is to set aside the rule, and then perhaps the agency comes back with a better rule or with distinct provisions that it has in this omnibus rule. But the statute itself has a severability provision, does it not? Well, as the Supreme Court said in Jackson, those severability clauses often aren't sufficient. They don't tell the court which provisions should be severed, nor does the rule justify its cost based on a partial rollout. The department said in the rule that the provisions in focus here were essential to its goals, and the department simply doesn't satisfy its burden to show that the rule is justified without the essential parts therein. For that reason, we ask this court to affirm the judgment below and uphold the injunction while this case proceeds. Thank you. I'm going to ask you a question. Are you just asking us to uphold Judge Reeve's position, which he wrote, or is it some variation of that? Yes, Your Honor. We're not requesting expanded relief at this time. We're asking this court to uphold the injunction as it was issued below. Thank you. If I may, just a few quick points. First, I think it's telling that neither plaintiffs nor interveners have cited any cases in which and have no cases to cite where on the basis that that's been treated as imposing something more than but-for causation. There just is no case law that they have, no courts have held that, and this court has held that, in fact, Title IX litigation or Title IX violations can happen on but-for causation or even on something less than but-for causation, something like motivating factor causation. I mean, I think they cited maybe the ADEA case. Your Honor, that's the Pelcher case. That's not any Title IX cases, and even then, the Pelcher case, it's difficult to see how it helps them. I mean, that case relied on Gross, which was the ADEA case from the Supreme Court, and in Gross, the Supreme Court said that because of language imposes but-for causation, and we know that because the Supreme Court in Vossock then cited Gross for the proposition that because of imposes but-for causation. So, again, there is no case law in the Title IX context that holds that on the basis of something less than but-for causation. Plaintiff's textual argument, as far as I understand it, is to pivot to structure, and, of course, structure informs the inquiry, but plaintiffs are conflating two different questions under Title IX. Title IX prohibits discrimination on the basis of sex, and so there are inherently two questions. What is discrimination, and what does it mean for discrimination to be on the basis of sex? And 106.10 just answers that last question. What does it mean for discrimination to be on the basis of sex? Different provisions, particularly 106.2 Harassment Standard and 106.3082's De Minimis Harassment Standard, address different questions, including what it means to have sex-separate bathrooms and restrooms. We think those provisions are valid, too, but plaintiffs' arguments about bathrooms and locker rooms are just about a different provision of the rule. It's not about what 106.10 is. The last point, Your Honor, is just that, as the Court's questions have indicated, the injunction is plainly overbroad. I mean, there are many provisions of the rule that have nothing to do with gender identity discrimination. I mean, the obvious ones, for example, are 106.40b. This is the provision that ensures protections and lactation spaces for pregnant and postpartum students. As the amicus that was submitted in this Court indicated, that provision is incredibly important to expecting mothers and new mothers, and there is no reason why 106.10 or any of the other provisions that issue in this rule have any effect on it. And we go through in our brief, Your Honor, and identify the many provisions that operate this way, independent of anything of the three challenge provisions that plaintiffs have here. And so our representation is that, at a minimum, it's overbroad as to the many provisions other than the three that are challenged here. We even think, as we said in our briefs, that 106.10, they haven't identified any harm from that. I mean, plaintiffs have, again, reiterated that there's no evidence that they are engaging in that kind of blatant discrimination, right, where you're forcing a transgender student to the back of the bus. Again, that's great, but two points there. One is that, although I think the state of Tennessee operates some schools, most schools in these plaintiff states operate independently under school districts that aren't directly kind of controlled by the states. And so on the state's view, those schools could tomorrow start, again, giving kids attention simply for being gay, giving kids attention simply for being transgender, and Title IX would have nothing to say about that. And that just cannot be right, both as a policy matter, but more importantly as a textual matter, because on the basis of sex means that when one discriminates on the basis of transgender status or sexual orientation under Title IX, they are necessarily discriminating on the basis of sex. Did you forfeit the issue of severance? No, Your Honor. I mean, we expressly raised it in the district court as part of our broader argument that any relief should be appropriately tailored. And I think to speak to the over-broadness of the injunction, that both equitable principles, it's black-letter law that injunctions should be no broader than necessary to afford relief to the plaintiffs, and the plaintiffs have only identified harm from three challenge provisions, and that is reinforced by the severability provisions. Severability was then raised at oral argument. Both sides addressed it. I believe plaintiffs addressed it also in their response brief, and the district court addressed it. So an argument that is passed and pressed on below is not forfeited. And then I guess the last point, Your Honor, interveners have raised the idea that this is an APA case, it's vacanter. I mean, this is a preliminary injunction, right? So even if the vacanter is an appropriate remedy and the government doesn't think it's always the case that it's an appropriate remedy, it would be no reason to enjoin the entire rule here where plaintiffs haven't shown any harm from the vast majority of the provisions or the application of those provisions. Very well. Any further questions? No. Thank you. All right. Thank you, Mr. Peters, for your argument. The case will be submitted.